#26553-r-DG
**2013 S.D. 68**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

MAGELLAN PIPELINE COMPANY,
LP LIC. NO. 1011-0693-ST,                    Petitioner and Appellant,

           v.

SOUTH DAKOTA DEPARTMENT
OF REVENUE AND REGULATION,                   Respondent and Appellee,


* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE WILLIAM J. SRSTKA, JR.
Retired Judge

* * * *

JAMES E. MOORE
MATTHEW P. BOCK of
Woods, Fuller, Shultz & Smith, PC
Sioux Falls, South Dakota                    Attorneys for petitioner
                                             and appellant.


ROSA YAEGER
South Dakota Department of
 Revenue and Regulation
Pierre, South Dakota                         Attorneys for respondent
                                             and appellee.

* * * *

CONSIDERED ON BRIEFS
ON MAY 20, 2013
OPINION FILED **09/04/13**

#26553

GILBERTSON, Chief Justice

[¶1.]     Magellan Pipeline Company, LP (Magellan) appeals a sales tax assessment by the Department of Revenue and Regulation (the Department) on additive injection and equipment calibration pipeline services. The Hearing Examiner, Department Secretary, and circuit court found that Magellan's additive injection and equipment calibration pipeline services are non-exempt from tax under SDCL 10-45-12.1. We reverse.

## FACTS

[¶2.]     We rely on the parties' stipulated facts. Magellan is a Delaware limited partnership headquartered in Tulsa, Oklahoma. Magellan's principal business is the transportation of refined petroleum products. Magellan owns and operates a refined petroleum products pipeline system, which covers a 13-state area, including South Dakota. Magellan has refined petroleum terminals in both Watertown and Sioux Falls.

[¶3.]     The refined petroleum products originate from direct connections to refineries and interconnections with other interstate pipelines. For the most part, Magellan's customers own the refined petroleum products transported through Magellan's pipeline. Magellan charges its customers a tariff rate for transporting refined petroleum products through its pipeline. When the refined petroleum products enter the terminal in Sioux Falls or Watertown, the products are either

stored onsite or delivered to Magellan customers through a rack.[1] Magellan also charges its customers for services Magellan provides at its terminals. Those services include: ethanol and biodiesel unloading and loading, additive injections, custom blending, laboratory testing, data services, other system services, and product storage. Additives are injected into the refined petroleum at the rack, which is the time Magellan customers take delivery of their products from a Magellan terminal. Some additives are mandated by law (e.g., gasoline detergent, diesel lubricity additive, and diesel dye) whereas others are non-mandatory (e.g., jet deicer, diesel detergent, and diesel cold flow improver).

[¶4.] In September 2009, the Department notified Magellan that it would begin an audit in March 2010. The audit would cover the period of September 2006 through September 2009. Later, the Department and Magellan agreed to extend the audit period through January 2010. Department Auditor Angela Bormann conducted the audit at Magellan headquarters in Tulsa, Oklahoma. Following the audit, the Department issued a certificate of assessment (COA) against Magellan, alleging a balance due of $241,274.52. Of the amount alleged to be owed, $190,268.50 was attributed to unpaid sales and use tax, and $51,006.02 was attributed to interest. The COA largely alleged unpaid sales tax for certain pipeline services, including charges related to additive injections.

[¶5.] Magellan notified the Department that it was contesting the total assessment but, under protest, paid the full tax assessment of $190,268.50.

---

1.    A rack is a mechanism capable of delivering petroleum products into a means of transport other than the pipeline, such as a tanker truck trailer or a railcar.

Initially Magellan requested a hearing. Later, however, the parties agreed to forgo a hearing and submitted stipulated facts for the Hearing Examiner's review. The primary issue before the Hearing Examiner was whether the fees Magellan charged for additive injections and equipment calibration pipeline services were subject to South Dakota sales tax. The Hearing Examiner entered a proposed decision affirming the Department's tax assessment of Magellan. The Secretary of the Department adopted the Hearing Examiner's decision in full.

[¶6.] Magellan appealed to the circuit court. The circuit court found that Magellan's additive injection and equipment calibration pipeline services were subject to South Dakota sales tax under SDCL 10-45-4, concluding that SDCL 10-45-12.1 exempts only pipeline transportation services. On appeal we consider whether Magellan's additive injection and equipment calibration pipeline services are exempt from South Dakota's sales tax under SDCL 10-45-12.1.

## STANDARD OF REVIEW

[¶7.] "Whether a statute imposes a tax under a given factual situation is a question of law [reviewed de novo] and thus no deference is given to any conclusion reached by the Department of Revenue or the circuit court." *TRM ATM Corp. v. S.D. Dep't of Revenue & Regulation*, 2010 S.D. 90, ¶ 3, 793 N.W.2d 1, 3 (quoting *S.D. Dep't of Revenue v. Sanborn Tel. Coop.*, 455 N.W.2d 223, 225 (S.D. 1990)); *see also Mauch v. S.D. Dep't of Revenue & Regulation*, 2007 S.D. 90, ¶ 8, 738 N.W.2d 537, 540. Further, "[s]tatutory interpretation and application are questions of law, and are reviewed by this Court under the de novo standard of review." *Pourier v. S.D. Dep't of Revenue & Regulation*, 2010 S.D. 10, ¶ 8, 778 N.W.2d 602, 604.

## ANALYSIS AND DECISION

[¶8.] Magellan argues that its additive injection and equipment calibration pipeline services are exempt from South Dakota's sales tax under SDCL 10-45-12.1. The critical inquiry is what the South Dakota legislature intended by exempting the services of "pipe lines" in SDCL 10-45-12.1. SDCL 10-45-12.1 provides that "[t]he following services enumerated in the Standard Industrial Classification Manual . . . are exempt from the provisions of this chapter: . . . pipe lines, except natural gas (major group 46)[.]" SDCL 10-45-12.1.

[¶9.] "When interpreting a statute, we 'begin with the plain language and structure of the statute.'" *In re Pooled Advocate Trust*, 2012 S.D. 24, ¶ 32, 813 N.W.2d 130, 141 (quoting *State ex rel. Dep't of Transp. v. Clark*, 2011 S.D. 20, ¶ 10, 798 N.W.2d 160, 164). "When the language in a statute is clear, certain, and unambiguous, there is no reason for construction, and this Court's only function is to declare the meaning of the statute as clearly expressed." *Id.* (quoting *Clark*, 2011 S.D. 20, ¶ 5, 798 N.W.2d at 162). Further, "'[w]hile every word of a statute must be presumed to have been used for a purpose, it is also the case that every word excluded from a statute must be presumed to have been excluded for a purpose.'" *Wheeler v. Farmers Mut. Ins. Co. of Neb.*, 2012 S.D. 83, ¶ 21, 824 N.W.2d 102, 109 (citation omitted).

[¶10.] "Statutes exempting property from taxation should be strictly construed in favor of the taxing power." *Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc. v. S.D. Dep't of Revenue*, 2002 S.D. 145, ¶ 5, 654 N.W.2d 779, 782 (quoting *Matter of Sales & Use Tax Refund Request of Media One, Inc.*, 1997

S.D. 17, ¶ 9, 559 N.W.2d 875, 877). "The words in such statutes should be given a reasonable, natural, and practical meaning to effectuate the purpose of the exemption." *Id.* (citation omitted). Further, the taxpayer "carries the burden of proving that [it] fall[s] within the exemption." *Id.* ¶ 12.

[¶11.] The Department asks this Court to find that SDCL 10-45-12.1 differentiates between Magellan's pipeline *transportation* services and its additive injection and equipment calibration pipeline services. If we were to interpret SDCL 10-45-12.1 to exempt pipeline transportation services and not additive injection and equipment calibration pipeline services, it would require us to read the word *transportation* into the statute. A plain reading of the statutory text, however, makes clear that SDCL 10-45-12.1 does not include the word "transportation" when referencing the "pipe lines" exemption.

[¶12.] Also helpful in assessing the Legislature's intent in SDCL 10-45-12.1 is the Legislature's treatment of pipe lines transporting natural gas. SDCL 10-45-12.1 provides an exemption for the services of "pipe lines, except natural gas[.]" SDCL 10-45-67 governs pipe lines transporting natural gas. It provides: "[t]he provision of natural gas *transportation* services by a pipeline is exempted from the provisions of this chapter and from the computation of the tax imposed by this chapter." (Emphasis added.) If the Legislature had intended that SDCL 10-45-12.1 also be limited to petroleum pipeline transportation services, it would have limited the petroleum pipeline services exemption as it did for natural gas pipelines in SDCL 10-45-67. Accordingly, we hold that the trial court erred in concluding that the additive injection and equipment calibration pipeline services provided by Magellan

were not the type of services the legislature intended to be exempt from tax under SDCL 10-45-12.1.

[¶13.]    We also note that an entity seeking an exemption for "pipe lines" services under SDCL 10-45-12.1 must be *eligible* for the exemption. That inquiry requires reference to the Standard Industrial Classification (SIC) Manual, which is directly referenced within SDCL 10-45-12.1. *Graceland*, 2002 S.D. 145, ¶ 7, 654 N.W.2d at 783 (stating that "SDCL 10-45-12.1 adopts the classification scheme set forth in the Standard Industrial Classification Manual (SIC) making it necessary to examine the SIC Manual in order to determine the proper classification"); *Sioux Falls Shopping News v. Dep't of Revenue & Regulation*, 2008 S.D. 34, ¶ 20, 749 N.W.2d 522, 526 (stating that "[t]he greater part of [SDCL 10-45-12.1] employs the SIC Manual to define specified exempt services").

[¶14.]    The Department classifies Magellan under industry number 4613 (refined petroleum pipelines), which falls within Major Group 46 in the SIC Manual. The portion of the SIC Manual that addresses Major Group 46 is titled "pipelines, except natural gas." This portion of the SIC Manual defines a refined petroleum pipeline as an: "[e]stablishment[] primarily engaged in the pipeline transportation of refined products of petroleum, such as gasoline and fuel oil." Office of Mgmt. & Budget, Standard Industrial Classification Manual 279 (1987). Because Magellan is an establishment primarily engaged in the pipeline transportation of refined petroleum products, it is eligible to receive the benefit of tax exemptions under SDCL 10-45-12.1. We hold that SDCL 10-45-12.1 exempts

additive injection and equipment calibration pipeline services, and that Magellan is eligible for such exemptions because of its Major Group 46 status.

[¶15.]    The Department argues that Magellan's position that the additive injection and equipment calibration pipeline services are exempt from tax under SDCL 10-45-12.1 is contrary to our prior holdings in which we have stated that: "when examining whether a tax applies, the focus belongs on the transaction, not the character of the participants." *Sioux Falls Shopping News*, 2008 S.D. 34, ¶ 23, 749 N.W.2d at 527 (citation omitted). The Department's argument is misplaced. The types of *transactions* at issue in this appeal, additive injection and equipment calibration services, squarely fall within the exemption for "pipe lines" services as set forth in SDCL 10-45-12.1.

[¶16.]    The parties disagree as to how our past case law should be utilized in deciding this dispute. For example, both parties rely on *Mauch v. S.D. Dep't of Revenue & Regulation*, 2007 S.D. 90, 738 N.W.2d 537, to support their differing arguments. In *Mauch*, this Court reversed the Department's assessment of tax against the services of an engineer. *Id.* ¶ 24. The Court found that the engineer's educational background and years of experience qualified him to provide "engineering services" as required under the exemption, even though he did not hold a professional license. *Id.* ¶ 22. In reversing the portion of the tax assessment related to engineering services, this Court found, in part, that the Department erred in incorporating other, unrelated statutes, which defined professional engineer. *Id.* ¶¶ 12-20. Like our ruling in *Mauch*, we will not apply text that is absent from a

particular statute. Accordingly, we decline the Department's request to read-in the term *transportation* to SDCL 10-45-12.1.

[¶17.] The parties also disagree as to the proper application of *Watertown Coop.* and the Court's use of the "predominant activity test" in that case. *See Watertown Coop. Elevator Ass'n v. S.D. Dep't of Revenue*, 2001 S.D. 56, 627 N.W.2d 167. *Watertown Coop.* involved a use tax assessment against Watertown Coop. for fees it paid for the services of crop production specialists (production specialists). *Id.* ¶ 5. The production specialists were employed directly by product distributors, however, Watertown Coop.'s practice was to "reimburse the distributors for all actual expenses of the production specialists, including salary, social security, income tax withholding, workers' compensation, equipment leases, travel, and other incidental expenses." *Id.* ¶ 2. The ranchers and farmers purchasing agronomy products from Watertown Coop. did not pay a direct fee for product specialist services, but Watertown Coop. built the cost of those services into the purchase price of the agronomy products. *Id.* ¶ 3. Tax related to the sale of the agronomy products themselves was not at issue because the sale of agronomy products was tax exempt. *Id.* ¶ 11.

[¶18.] Watertown Coop. argued that the services were "an 'inextricable part' of the sale of exempt agronomy products." *Id.* The Court disagreed, concluding that use tax should be applied because the services involved the performance of services, rather than the sale of agronomy products. *Id.* ¶ 14. The Court clarified its use of the predominant activity test by noting that: "[h]ere, the dispositive transaction occurred with the distributors and [Watertown Coop.], not with the ultimate sale of

agronomy products or in providing production specialist services to farmers and ranchers." *Id.* ¶ 12.

[¶19.] In *Watertown Coop.*, the Court used the predominant activity to clarify that the services being provided were between the taxpayer, Watertown Coop., and the distributors, rather than Watertown Coop. and the farmers and ranchers (who were the actual recipients of the agronomy products, which qualified for the exemption). *Id.* ¶¶ 12-14. The case before us is distinguishable from *Watertown Coop.* because that case involved the imposition of tax when the taxpayer attempted to attach services that were separate and distinct from the actual tax exemption. Here, it is not necessary to apply the predominant activity test because of our finding that additive injection and equipment calibration pipeline services squarely fall within the pipeline services tax exemption provided in SDCL 10-45-12.1. *Watertown Coop.* required this Court to utilize the predominant activity test to distinguish the relationships among three separate parties: the taxpayer, its customer, and its distributor. Our case is distinctly different in that the services at hand involve only two parties: Magellan and its customers.[2]

### CONCLUSION

[¶20.] Under the plain language of SDCL 10-45-12.1, Magellan's additive injection and equipment calibration pipeline services are exempt from sales tax. We reverse.

---

2. Because we find that Magellan's additive injection and equipment calibration pipeline services are tax exempt under SDCL 10-45-12.1, we need not reach the issue of interest assessed against Magellan on the COA.

#26553

[¶21.]     SEVERSON, Justice, concurs.

[¶22.]     ZINTER, Justice, and KERN, Circuit Court Judge, concur specially.

[¶23.]     KONENKAMP, Justice, dissents.

[¶24.]     KERN, Circuit Court Judge, sitting for WILBUR, Justice, disqualified.


ZINTER, Justice (concurring specially).

[¶25.]     SDCL 10-45-12.1 is a lengthy listing of sales tax exemptions. The Legislature used different language in the statute to describe two types of exemptions. In the first, the Legislature exempted specifically described "services" performed by "establishments" referenced in the SIC. Representative examples include "health services," "educational services," "social services," "agricultural services," "forestry services," and "trucking and courier services." *See* SDCL 10-45-12.1.[3] In the second, the Legislature more broadly exempted entire

---

3.     SDCL 10-45-12.1 provides:

The following services enumerated in the Standard Industrial Classification Manual, 1987, as prepared by the Statistical Policy Division of the Office of Management and Budget, Office of the President are exempt from the provisions of this chapter: *health services* (major group 80); *educational services* (major group 82) except schools and educational services not elsewhere classified (industry no. 8299); *social services* (major group 83); *agricultural services* (major group 07) except veterinarian services (group no. 074) and animal specialty services, except veterinary (industry no. 0752); *forestry services* (group no. 085); *radio and television broadcasting* (group no. 483); *railroad transportation* (major group 40); *local and suburban passenger transportation* (group no. 411) except limousine services; *school buses* (group no. 415); *trucking and courier services*, except air (group no. 421) except collection and disposal of solid waste; *farm product warehousing and storage* (industry no. 4221);

(continued . . .)

-10-

#26553

"establishments" or "industries."  Representative examples of those exemptions

_____

(. . . continued)

*establishments* primarily engaged in transportation on rivers and canals (group no. 444); *establishments* primarily engaged in air transportation, certified carriers (group no. 451); *establishments* primarily engaged in air transportation, noncertified carriers (group no. 452) except chartered flights (industry no. 4522) and airplane, helicopter, balloon, dirigible, and blimp rides for amusement or sightseeing; *pipe lines*, except natural gas (major group 46); *arrangement of passenger transportation* (group no. 472); *arrangement of transportation* of freight and cargo (group no. 473); *rental of railroad cars* (group no. 474); *water supply* (industry no. 4941); *sewerage systems* (industry no. 4952); *security brokers, dealers and flotation companies* (group no. 621); *commodity contracts brokers and dealers* (group no. 622); *credit counseling services* provided by individual and family social services (industry no. 8322); *construction services* (division C) except industry no. 1752 and locksmiths and locksmith shops; *consumer credit reporting agencies, mercantile reporting agencies, and adjustment and collection agencies* (group no. 732), if the debt was incurred out-of-state and the client does not reside within the state.  The following are also specifically exempt from the provisions of this chapter: *financial services* of institutions subject to tax under chapter 10-43 including loan origination fees, late payment charges, nonsufficient fund check charges, stop payment charges, safe deposit box rent, exchange charges, commission on travelers checks, charges for administration of trusts, interest charges, and points charged on loans; commissions earned or service fees paid by an insurance company to an agent or representative for the sale of a policy; *services of brokers and agents* licensed under Title 47; the sale of trading stamps; rentals of motor vehicles as defined by § 32-5-1 leased under a single contract for more than twenty-eight days; *advertising services;* services provided by *any corporation to another corporation which is centrally assessed* having identical ownership and services provided by any corporation to a wholly owned subsidiary which is centrally assessed; continuing education *programs*; *tutoring*; *vocational counseling*, except rehabilitation counseling; and motion picture rentals to a commercially operated theater primarily engaged in the exhibition of motion pictures.

(Emphasis added.)

include "establishments" primarily engaged in river transportation, "establishments" primarily engaged in air transportation, certain centrally assessed corporations, water supply and sewage system "industr[ies]," security and commodity "brokers" and "dealers," and "credit and collection agencies." *See id.*

[¶26.] The statutory language at issue in this case is of the second type exempting pipeline establishments. *See id.* (exempting "pipe lines, except natural gas (major group 46)"). Unlike the first exemption for specifically described services, the Legislature did not limit the "pipe line" exemption to any particularly described service provided by pipelines. *See id.* Because the Legislature chose to exempt pipeline establishments rather than any particular service they provide,[4] and because there is no dispute that Magellan's economic activity falls within major group 46 (pipeline establishments), Magellan is entitled to the exemption for the pipeline services it provides. Further, because the Department does not dispute

---

4. The dissent opines that there are not two types of exemptions, suggesting that there is no establishment exemption. The dissent reasons that "the Legislature simply took the language used by the SIC and chose which services it intended to allow service exemptions." *See* Dissent ¶ 39. But this disregards the clear difference in the statutory language describing each exemption. Moreover, the SIC Manual "was developed for use in the classification of *establishments* by the type of activity in which they are engaged[.]" SIC Manual at 11 (emphasis added). And establishments are defined as "an economic unit . . . where *business is conducted or where services* or industrial operations are performed." *Id.* at 12 (emphasis added). Therefore, the SIC Manual also recognizes the distinction between a business establishment and the services it may provide. Because the SIC Manual incorporates this distinction, one cannot simply sweep aside the Legislature's decision to in some cases use language exempting entire establishments without qualification, but in other cases use language limiting the exemption to a particular service provided by a classified establishment.

that additive injection and equipment calibration are services provided by pipelines, those services are exempt.

[¶27.]    Had the Legislature intended to exempt only the "transportation" services provided by pipelines, the Legislature would have used the word "transportation" in a specifically described service exemption, as it did throughout most of SDCL 10-45-12.1.  Any question about legislative intent is resolved by examining the Legislature's treatment of other establishments.

[¶28.]    The Legislature's comparative treatment of petroleum and natural gas pipelines is especially significant.  In contrast to the establishment exemption provided for petroleum pipelines, the Legislature used the particularly described service exemption for natural gas pipelines.  As previously noted, SDCL 10-45-12.1 has no language limiting the exemption for petroleum pipelines as long as they are classified in "major group 46."  But when the Legislature decided to exempt natural gas pipelines, it used the particularly described service language, only exempting "[t]he provision of natural gas *transportation services* by a pipeline."  SDCL 10-45-67 (emphasis added).  And this is not the only example of the Legislature's decision to use the more limited and particularly described service exemption when it desired to restrict an establishment's exemption to a particular service.  *See* SDCL 10-45-12.1 (limiting an exemption to "*credit counseling services* provided by individual and family social services").  Thus, when the Legislature has intended to limit an establishment's exemption to a particular service, whether in SDCL 10-45-12.1 or in a separate statute, it has done so.  But in the case of petroleum pipelines, the Legislature chose not to limit the exemption to *transportation* services.

[¶29.]     The dissent would deny an exemption in this case, but it does so only by adding the words "transportation services" to the pipeline establishment exemption statute.  The dissent correctly notes that major group 46 "includes establishments primarily engaged in the pipeline transportation of petroleum or other commodities[.]"  *See* SIC Manual at 279.  But the dissent then incorrectly relies on other SIC Manual language indicating that where "distinct and separate" "economic activities" are provided at a single physical location, each activity should be classified as a separate "establishment" (presumably with different, non-exempt classification numbers).[5]  *See* Dissent ¶¶ 42-43 (concluding that there is no evidence

---

5.     The Department makes a closely related argument based on our decisions in *Mauch v. South Dakota Department of Revenue & Regulation*, 2007 S.D. 90, ¶¶ 9-24, 738 N.W.2d 537, 540-44, *Cooperative Agronomy Services v. South Dakota Department of Revenue*, 2003 S.D. 104, ¶¶ 14-15, 668 N.W.2d 718, 722-23, and similar decisions.  The Department points out that in those cases, we noted that taxability is based on the transaction and not the classification or primary business of the taxpayer.  But in the Department's cases, the issue involved the taxpayer's *entitlement* to a particular *classification*.  The "SIC Manual [is used under the statutory scheme] in order to determine the proper classification."  *Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc. v. S.D. Dep't of Revenue*, 2002 S.D. 145, ¶ 7, 654 N.W.2d 779, 783.  Therefore, in the Department's cases, it was necessary to focus on the transactions to determine whether the entity fit within the claimed classification.  Here, there is no dispute that Magellan is classified as a pipeline in major group 46.  Therefore, the "transaction" cases are not helpful.

The Department's reliance on "predominant activity" cases is also misplaced.  *See, e.g.*, *TRM ATM Corp. v. S.D. Dep't of Revenue & Regulation*, 2010 S.D. 90, ¶ 9, 793 N.W.2d 1, 4 ("[I]n analyzing the taxability of a service, the dispositive inquiry focuses on the predominant activity in the transaction between those parties who exchange consideration for the service.").  Here, Magellan satisfies that test because there is no dispute that Magellan's primary activity involves the transportation of petroleum products.  Moreover, the predominant activity test is used in applying SDCL 10-45-4.1,

(continued . . .)

that a petroleum pipeline injects additives and calibrates its equipment as a part of its service of transporting petroleum, and no industry classification has been cited to include each of those activities).

[¶30.] There are two errors in the dissent's analysis. First, to qualify for the SIC major group 46 exemption, *each* service provided by a petroleum pipeline need not be classified as an "establishment 'primarily engaged in the pipeline transportation of petroleum.'" The SIC Manual provides that "[e]ach operating establishment is assigned an industry code on the basis of its *primary* activity, which is determined by its *principal* . . . services rendered." SIC Manual at 15 (emphasis added). Consequently, to qualify for exempt classification in major group 46, the establishment need only be "primarily" engaged in the pipeline transportation of petroleum. *See id.* at 279. And by basing classification on an establishment's primary activity and principal service rather than each included service, the SIC Manual recognizes that the primary activity controls even though other services may be provided.

[¶31.] Nevertheless, the dissent contends that separate classifications are required because the SIC Manual requires separate classification where "no one industry description in the classification includes . . . *combined* activities[,]" and "the employment in each . . . economic activity is *significant*." *See* Dissent ¶¶ 41-42 (emphasis added) (citing SIC Manual at 12). The Department has not made this

_____

(. . . continued)

a statute that has a different purpose; i.e., to define a "service." Here, there is no dispute that Magellan's injection and calibration activities are services.

argument on appeal, and the dissent errs in relying on this language because neither test is satisfied in this case.

[¶32.]      The first test is not satisfied because major group 46 classification describes the combined activities that Magellan provides. The dissent contends that there is no evidence that additive injection and equipment calibration services are part of Magellan's primary service of transporting petroleum. But the stipulated facts reflect that those services are a necessarily included part of the services Magellan provides in transporting petroleum products. The stipulation reflects that when petroleum products are transported in interstate pipelines, the petroleum products are fungible, and Magellan must inject them with additives[6] at the time its customers take delivery of the individual products at the terminal rack. Those additive services are necessarily combined because some of the additives are "end-product components" that are "mandated" to be injected under state and federal law. Stipulated Facts ¶¶ 19-21. Other additives must be injected to differentiate between proprietary brands or to enhance diesel performance.[7] *Id.*

[¶33.]      The second test is not satisfied because there is no dispute that the additive injection and related equipment calibration services are a relatively

---

6.    Equipment calibration services are necessary to monitor the additive injections.

7.    The specific additives that must be injected at the rack include gasoline detergent, diesel lubricity additive, diesel dye, jet fuel deicer, diesel cold flow improver, diesel detergent, and proprietary additives. Proprietary additives are required because pipelines provide the same fungible petroleum products to competing retailers. The products must be injected with proprietary additives at the pipeline terminal so the products may be differentiated when sold at retail.

insignificant part of Magellan's pipeline services. This is a 9,500 mile pipeline crossing thirteen states in its transportation of petroleum from refineries throughout the country to fifty-one terminals, including those in South Dakota. But the additives are injected only at the very end of that journey when the petroleum products are being loaded into the customer's trucks as they leave the terminals. Because the injection and calibration services are a relatively insignificant part of a pipeline's economic activity, and because major group 46 describes those combined services, the "distinct and separate economic activity" test is not satisfied. Therefore, the SIC Manual provides no basis to require separate industry codes for the injection and calibration services Magellan necessarily includes in its transportation of petroleum products.

[¶34.] Entitlement to a tax exemption must be based on the language of the statute. *Sioux Falls Shopping News, Inc. v. Dep't of Revenue & Regulation,* 2008 S.D. 34, ¶ 26, 749 N.W.2d 522, 527 (noting that a court may not include language in the tax statutes that the Legislature did not employ). The Legislature limited the natural gas pipeline exemption to "transportation services," but the Legislature did not use (or incorporate by reference) any language limiting the petroleum pipeline exemption to "transportation" or any other particular service. Instead, the Legislature broadly exempted petroleum "pipe line" establishments from sales taxation. Because the Department agrees that Magellan is a petroleum pipeline establishment that falls within major group 46, there is no statutory basis to limit Magellan's exemption to any of the pipeline services it provides. And because the

injection and calibration services are pipeline services provided by an establishment classified in major group 46, the services are exempt under SDCL 10-45-12.1.

[¶35.]     KERN, Circuit Court Judge, joins this special writing.


KONENKAMP, Justice (dissenting).

[¶36.]     The Court analyzes the issue here backwards. It begins with the exemption statute, SDCL 10-45-12.1, without first looking to what taxable services Magellan provides. To be exempt, the activity must first be taxable. As SDCL 10-45-4 provides, the gross receipts of a service rendered by a business are taxable "unless the service is *specifically exempt* from the provisions of this chapter." (Emphasis added.) A "service" is defined as "all activities engaged in for other persons for a fee, retainer, commission, or other monetary charge, which activities involve predominantly the performance of a service as distinguished from selling property." SDCL 10-45-4.1.

[¶37.]     Magellan Pipeline Company provides multiple services for its customers, including storing, transporting, and injecting additives into refined petroleum products, and calibrating equipment. Because these services are rendered to customers for a fee, those services are taxable unless specifically exempted.

[¶38.]     After identifying the taxable services, the next step is to determine whether any of those services are specifically exempted. Taxpayers have the burden of proving entitlement to an exemption. *In re State Sales & Use Tax Liab. of Pam Oil, Inc.*, 459 N.W.2d 251, 255 (S.D. 1990). Exempting statutes are construed

strictly in favor of the taxing power. *Watertown Coop.*, 2001 S.D. 56, ¶ 10, 627 N.W.2d at 171 (citing *In re State & City Sales Tax Liab. of Quality Serv. Railcar Repair Corp.*, 437 N.W.2d 209, 211 (S.D. 1989)).

[¶39.]     Under SDCL 10-45-12.1, "[t]he following services enumerated in the Standard Industrial Classification Manual, 1987, as prepared by the Statistical Policy Division of the Office of Management and Budget, Office of the President are exempt from the provisions of this chapter: . . . *pipe lines*, except natural gas (major group 46)[.]" (Emphasis added.) Contrary to the special writing's view, the language of SDCL 10-45-12.1 does not show that the Legislature acted specifically to create or describe "two types of exemptions." Rather, a closer comparison of the statute and the SIC Manual reveals that the Legislature simply took the language used by the SIC Manual and chose which services it intended to allow service exemptions. In particular, the language "pipe lines, except natural gas" is *directly* from the SIC Manual. The SIC Manual, not the South Dakota Legislature, excluded natural gas from major group 46. Thus, it is illogical to declare that the Legislature's different treatment of *petroleum pipelines* and *natural gas* is a significant indication of the Legislature's intent to treat petroleum pipelines "more broadly."

[¶40.]     Moreover, because the Legislature specifically referred to the SIC Manual *and* because what constitutes "pipe lines," as contemplated by SDCL 10-45-12.1 is not clear from the text of the statute, we must examine the language of that manual. In regard to "pipe lines, except natural gas," SIC Group 46 is the starting point. That group "includes establishments primarily engaged in the pipeline

transportation of petroleum or other commodities, except natural gas." Then, within group 46, there are three Industry Groups. Relevant here is the industry entitled, Refined Petroleum Pipelines. That industry is defined as "[e]stablishments primarily engaged in the pipeline transportation of refined products of petroleum, such as gasoline and fuel oil." Magellan is an establishment primarily engaged in the pipeline transportation of refined petroleum products.

[¶41.] The analysis, however, should not stop there. Because Magellan's services of storing refined petroleum, calibrating equipment, and injecting additives are not necessarily services offered by an establishment primarily engaged in the pipeline transportation of refined petroleum, Magellan must prove entitlement to an exemption for those services. On this point, the SIC Manual is controlling.

[¶42.] The SIC Manual defines an "establishment" as "an economic unit, generally at a single physical location, where business is conducted or where services or industrial operations are performed." "Where *distinct and separate* economic activities are performed at a single physical location . . . such activity should be treated as a separate establishment where: (1) no one industry description in the classification includes such combined activities; (2) the employment in each such economic activity is significant; and (3) separate reports can be prepared on the number of employees, their wages and salaries, sales or receipts, and other types of establishment data." (Emphasis added.)

[¶43.] Here, Magellan, a pipeline establishment, performs *distinct and separate* economic activities with refined petroleum products: storing, transporting, injecting additives either by customer request or by legal mandate, and calibrating

equipment. There is no evidence that a pipeline establishment stores refined petroleum, calibrates equipment, and injects additives as part of its service of transporting refined petroleum. Moreover, there is no industry classification cited to include all such activities. Thus, Magellan has failed to meet its burden of proving an exemption. And Magellan keeps separate sales reports on its injecting of additives and equipment calibration. Because we must remain cognizant of the fact that "[e]xemptions are a matter of legislative grace and doubts are resolved in favor of taxation[,]" Magellan's separate and distinct services of injecting additives and calibrating equipment should be deemed separate and distinct economic activities with refined petroleum products. *See In re State Sales & Use Tax Liab. of Townley*, 417 N.W.2d 398, 400 (S.D. 1987).